## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| OMAR M. REZAQ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 13-cv-00990-MJR-SCW |
| | ) | |
| FEDERAL BUREAU OF PRISONS, | ) | |
| M. WINKLEMEIR, | ) | |
| LESLEE BROOKS, and | ) | |
| PAUL HARVEY, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM AND ORDER

**REAGAN, Chief District Judge:**

Pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, **403 U.S. 388 (1971),** the Religious Freedom Restoration Act, **42 U.S.C. § 2000bb-1,** and the Administrative Procedure Act**, 5 U.S.C. § 702**, *pro se* Plaintiff Omar M. Rezaq brought this action against several individuals and the Federal Bureau of Prisons concerning his medical care and a conflict between his Muslim religious beliefs and prison policies during Ramadan regarding distribution of his medication.   This matter is currently before the Court on Defendants' motion for summary judgment (Docs. 85 and 86).   Plaintiff has filed a response in opposition to the motion (Doc. 89).   For the reasons put forth in this memorandum and order, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff's complaint alleges that Defendants were deliberately indifferent to his

chronic arthritis and violated his religious rights by failing to alter their morning medication schedule to accommodate Plaintiff's observance of Ramadan. Specifically, Count 1 of Plaintiff's complaint alleges that Clinical Director Paul Harvey and Physician Assistant Leslee Brooks denied Plaintiff adequate care in violation of the Administrative Procedure Act. Count 2 alleges that Brooks was deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth Amendment. Count 4 alleges that the Bureau of Prisons and Health Services Administrator Winklemeir refused to accommodate Plaintiff's morning pill line to meet the requirements of Ramadan in violation of Plaintiff's rights under the Religious Freedom Restoration Act.

Plaintiff has been housed at the United States Penitentiary at Marion since October 26, 2010. From the beginning of his incarceration onward, he has complained of pain in his leg. Specifically, Plaintiff complained to Fernando Castillo, a Mid-Level Practitioner, about his left hip and leg pain on December 10, 2010 (Doc. 85-1). Plaintiff indicated his pain level was a 9 on a 10 point scale and that the pain started when he stood up from prayer (*Id.*). Castillo diagnosed his pain as temporary/acute and prescribed Plaintiff Naproxen and ordered an x-ray of Plaintiff's knee and hip (*Id.*; Doc. 85-2). The x-rays of Plaintiff's knee were negative except for a small effusion on his left knee (Doc. 85-3). Plaintiff again saw Castillo in January 2011, this time for shoulder pain (Doc. 85-5). Plaintiff was prescribed Prednisone and Naproxen (*Id.*).

Plaintiff was next seen by Castillo on February 2, 2011, where he complained of right hip and femur sprain or strain. X-rays were ordered and Plaintiff was provided

with Ibuprofen (Doc. 85-7).   X-rays of the area were negative (Doc. 85-9).   Plaintiff returned to the healthcare unit on February 14, 2011, complaining of right shoulder pain which increased with the use of Motrin or Naproxen (Doc. 85-11).   Plaintiff sought some other medication to treat the pain (*Id*.).   Plaintiff was provided with a prescription for Indomethacin, a non-steroidal, anti-inflammatory medication (*Id*.).

Plaintiff was next seen on July 28, 2011, again complaining of right shoulder pain. Plaintiff was prescribed Prednisone and had his prescription for Indomethacin renewed (Doc. 85-13).   He next saw Clinical Director David Szoke on August 25, 2011, for pain and stiffness in his right shoulder (Doc. 85-15).   Szoke noted that Plaintiff claimed to have suffered from the pain for two plus years (*Id*.).   Szoke also noted that prior x-rays indicated mild degenerative joint disease (*Id*.).   Szoke performed an exam and noted that Plaintiff was able to raise his right arm 90 degrees but could not perform a lift off maneuver (*Id*.).   He anesthetized Plaintiff's shoulder and injected it with Kenalog to reduce the pain (*Id*.).   Szoke saw Plaintiff again on August 29, 2011, for his right shoulder and prescribed Carbamazepine for his nerve pain (Doc. 85-17 at 9).

Plaintiff saw Castillo again in January 2012 and his Naproxen prescription was renewed for his leg pain (Doc. 85-19).   Another x-ray of Plaintiff's right knee was ordered (Doc. 85-21).   He was seen by Castillo again on February 9, 2012, for left neck pain.   Castillo noted tenderness and decreased range of motion (Doc. 85-23).   Although Plaintiff wanted another medication to specifically treat his neck, Castillo noted that Plaintiff was already taking Naproxen for his knee which would also help to alleviate his

neck pain (*Id*.).   Castillo saw Plaintiff again on February 22, 2012, for his neck pain and Plaintiff complained that his pain had increased (Doc. 85-25).   Castillo prescribed Salsalate tablets for his pain and ordered a cervical spine x-ray which was negative (Doc. 85-27).   Castillo also received and reviewed Plaintiff's x-rays for his right knee which were negative except for mild degenerative joint disease (Doc. 85-29).

Szoke saw Rezaq on February 28, 2012, for shoulder, cervical, and back pain (Doc. 85-31).   Plaintiff reported that that his posterior neck and left shoulder were numb (*Id*.). Plaintiff asked for Gabapentin, which Szoke prescribed (*Id*. at 5).   Szoke also ordered x-rays of his spine and cervical spine (*Id*. at 6).   Castillo saw Plaintiff again in March for his neck pain, and Plaintiff reported that he had been prescribed steroids in the past with good results (Doc. 85-33).   Castillo prescribed Plaintiff Prednisone (*Id*.).   Castillo saw Plaintiff again in April for left neck pain and later that same month for right knee pain (Doc. 85-35 and 85-37).   Castillo noted that prior x-rays of his knee indicated mild joint disease (Doc. 85-37).   Plaintiff was again prescribed Prednisone and Naproxen.

Castillo saw Plaintiff again on May 22, 2012, for neck pain.   Plaintiff indicated at that time that he wished to see a doctor (Doc. 85-39).   Plaintiff's Salsalate tablet prescription was renewed (*Id*.).   His Naproxen prescription was renewed on June 5, 2012 (Doc. 85-41).   Plaintiff saw Castillo two more times in June and July and requested to see Dr. Szoke for neck and knee pain (Doc. 85-43, 85-45).   Plaintiff was scheduled to see Szoke and Castillo counseled him on joint disease (Doc. 85-45).   Castillo also noted that he was prescribed Neurontin but had not taken it due to the Ramadan fast (*Id*.).

Plaintiff saw Dr. Szoke on August 13, 2012 (Doc. 85-47).   Szoke noted left neck pain, right and left shoulder pain, right knee pain, and low back pain (*Id*.).   Szoke also noted that Plaintiff complained that his pain in his right knee had been ongoing for three to four years (*Id*.).   Szoke noted that a right knee x-ray from February showed only mild degenerative joint disease (*Id*.).   Plaintiff had been given a prescription for Gabapentin which Plaintiff complained had no effect (*Id*.).   Plaintiff's prescription for Gabapentin was renewed and x-rays of his shoulder and cervical and lumbar spine were ordered (*Id*. at 7-8).   Szoke prescribed Plaintiff a soft C collar for his left neck pain the next day and indicated that he would monitor the progress for 45 days (Doc. 85-49).   Plaintiff returned the collar on August 20, 2012, and asked for a smaller one; he was told that one would be provided if available (Doc. 85-50).   His x-rays were also approved (Doc. 85-2).

Plaintiff first saw Physician's Assistant Leslee Brooks for the conditions at issue in his complaint on October 1, 2012.   Plaintiff complained the he suffered from unbearable knee pain across the inside joint of his right knee (Doc. 85-4).   Plaintiff noted that he was experiencing severe pain, even in bed (*Id*.).   Brooks noted that previous x-rays found only mild degenerative joint disease (*Id*.).   Brooks performed an exam of Plaintiff's knee and noted no tenderness and full range of motion (*Id*.).   Brooks noted that Plaintiff's complaints were out of proportion with the exam results (*Id*.).

The next day, Brooks indicated that Plaintiff complained that there was something wrong with his left knee beyond arthritis because the pain had not gone away and was not in his right knee (Doc. 85-6).   Brooks educated Plaintiff on arthritis

progression, continued with a Naproxen routine, and indicated that Plaintiff's knee would be injected if there were further issues (*Id.*).   X-ray results for Plaintiff's shoulder and spine were received on October 3, 2012, and it was noted that the spine x-rays were negative except for moderate degenerative disc disease and mild rightward curvature of the lumbar spine (Docs. 85-8 and 85-10).   Similarly, the x-rays of the shoulder were negative except for mild joint disease in the left shoulder (Docs. 85-12 and 85-14).

Brooks saw Plaintiff again on October 17, 2012, for lower extremity pain (Doc. 85-16).   Brooks injected Plaintiff's right knee with a steroid (*Id.*).   Plaintiff reported to Brooks on November 1st that the neck brace did not help (Doc. 85-18).   Plaintiff presented to Brooks on November 15th with right hip pain, which radiated down his leg to his ankle (Doc. 85-20).   Plaintiff noted that the pain started 3-4 days prior.   Plaintiff was prescribed Prednisone and Naproxen and was told to exercise and stretch (*Id.*).   Brooks noted this as a new occurrence of hip pain (*Id.*).   Plaintiff returned to Brooks on November 29th, reporting that the steroids resolved his radiating pain but it had returned (Doc. 85-22).   Brooks noted that Plaintiff was non-compliant with Gabapentin as he missed several doses (*Id.*).   Brooks indicated that Plaintiff's medication would not be changed until he sustained a therapeutic dose and the effects were noted (*Id.*).

Plaintiff met with Szoke on February 28, 2013, at which time Szoke noted that Plaintiff had chronic pain complaints of his shoulder, knee, and lower back (Doc. 85-24).   Plaintiff indicated that he believed a different mattress would help (*Id.*).   Szoke noted that prior x-rays showed mild degenerative disc disease and mild degenerative joint

disease in his left shoulder (*Id.*).   Szoke noted that Plaintiff was able to walk and have free range of motion in his spine, knees, and shoulders (*Id.*).   Szoke noted that changes in his weight bearing were consistent with age (*Id.*).   Plaintiff indicated that he believed he needed surgery (*Id.*).   Plaintiff's prescription for Gabapentin was continued (*Id.*).

Plaintiff saw Brooks again on April 10, 2013, with complaints of pain in his left elbow which occurred while doing pull-ups (Doc. 85-26).   Plaintiff said that he had tried over the counter medications and heat and ice with no improvement (*Id.*).   Brooks noted that there were no commissary receipts which indicated he had purchased pain medication in the past four months (*Id.*).   Brooks recommended range of motion exercises and massage (*Id.*).   She also recommended over the counter medications (*Id.*).

Plaintiff again saw Brooks on May 3, 2013, for pain in his right hip.   He reported to Brooks that the pain was driving him crazy and something had to be done to alleviate it (Doc. 85-28).   X-rays were ordered and Brooks indicated that he should try walking, stretching, and over the counter pain medications to help (*Id.*).   Plaintiff's x-rays were negative except for mild degenerative joint disease (Doc. 85-30).

Brooks saw Plaintiff on August 20, 2013, as his Gabapentin prescription was expiring (Doc. 85-32).   She noted that Plaintiff had missed 21 of the last 60 doses (*Id.*). Plaintiff complained of pain and Brooks noted that he had been educated on the need to comply with medication directives (*Id.*).   Plaintiff saw Brooks again on September 23, 2013, for his left elbow pain (Doc. 85-34).   Plaintiff indicated he was taking over the counter medication but there were none on his commissary purchases (*Id.*).   Brooks

placed Plaintiff on sports and exercise restriction and ordered an x-ray (*Id.*).   Although Plaintiff was ordered to stop exercise, Brooks saw him participating in yoga on October 1, 2013 (Doc. 85-36).   X-rays of his elbow and hip came back negative (Doc. 85-38).

Plaintiff was seen by Paul Harvey, the North Central Region Medical Director, on October 17, 2013.   Harvey noted that Plaintiff had degenerative joint disease since 2012 and 2013 and that his medications needed to be renewed.   Harvey also increased his dosage of Gabapentin (Doc. 85-40).   Harvey also noted that Plaintiff was wearing a neoprene sleeve on his right knee during Harvey's examination (*Id.*).

Brooks indicated in an administrative note from October 22, 2013, that Plaintiff became agitated while taking his morning dose of Gabapentin and threw the bag of medication on the floor and spit out the medication (Doc. 85-42).   He complained that the medication was crushed too small and tasted bad (*Id.*).   He was warned that if he continued with that behavior his medication would be stopped (*Id.*).   Plaintiff saw Brooks again on December 9, 2012, for tendonitis in his left elbow (Doc. 85-44).   He complained that the Gabapentin caused him headaches and made him feel "altered" (*Id.*).   Plaintiff also complained that the drug did not help with his pain and he wanted another medication.   Plaintiff was advised by Brooks that all medication had side effects (*Id.*).   Plaintiff's Gabapentin prescription was renewed (*Id.*).

Plaintiff saw Castillo again on February 25, 2014, complaining that his right knee pain was worse than ever (Doc. 89-1 at 4).   Castillo noted that Plaintiff had a 7 to 10 year history of knee pain and that he originally injured it playing handball (*Id.*).

Plaintiff noted that the pain was 50% worse than the week before (*Id*.).

Plaintiff met with the Orthopaedic Institute of Southern Illinois in June 2015 for the pain in his right knee (Doc. 89-1 at 27).   Plaintiff described his pain to the specialist as mild-moderate and said that it started originally while working out and had increased (*Id*.).   He stated that it sometimes kept him from walking and he cannot kneel or pivot (*Id*.).   The specialist indicated that an MRI showed a complex parameniscal cyst and a tear of the lateral meniscus, along with significant osteoarthritis (*Id*. at 29).

As it relates to Plaintiff's claims under the Religious Freedom Restoration Act, wardens at Marion added an evening pill line in 2012 and 2013 for practicing Muslims (Docs. 85-46 and 85-48).   Defendants acknowledge that the morning pill line was not adjusted to accommodate Ramadan.   Plaintiff notes that the 2015 Ramadan guidelines from the Chief Executives of the Bureau of Prisons indicate that institutions should consider alternate pill line times for Ramadan participants (Doc. 89-1 at 32-33).   Further, Plaintiff offers a memorandum from ADX Florence which offered both morning and evening pill line accommodations for Ramadan in 2015 (Doc. 89-1 at 35).

## Legal Standards

Summary judgment is proper only "if the admissible evidence considered as a whole shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   ***Dynegy Marketing & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011) (*citing* Fed. R. Civ. P. 56(a)).**   A fact is material if it is outcome determinative under applicable law, and a genuine issue of material fact exists

if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the initial burden of demonstrating—based on the pleadings, affidavits, and information submitted—the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After a proper motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (*quoting* FED. R. CIV. P. 56(e)(2)).

On summary judgment, the Court considers the facts in the light most favorable to the non-movant, and adopts reasonable inferences and resolves doubts in the non-movant's favor. *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009). Even if the material facts are not in dispute, summary judgment is inappropriate when the information before the Court reveals that "alternate inferences can be drawn from the available evidence." *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004), *abrogated on other grounds by Spiegla II*, 481 F.3d at 966 (7th Cir. 2007).

## ANALYSIS

### A. Administrative Procedure Act Claim

Plaintiff indicates in his complaint that he brings his claims under the Administrative Procedure Act, arguing that the policies of the Bureau of Prisons and its staff in failing to properly treat age-related arthritis and pain is a violation of the Act. The Seventh Circuit has held that a federal inmate can bring a claim under the Administrative Procedures Act for an order for medical treatment. *See Glaus v.*

*Anderson*, 408 F.3d 382, 387 (7th Cir. 2005) (noting that an inmate could challenge Bureau guidelines under the Act related to specific treatment for a condition).   That said, the Seventh Circuit has also noted that Bureau Program Statements and Clinical Practice Guidelines related to medical treatment do not provide a source of relief as they "do not create entitlements enforceable under the [Act]."   *See Robinson v. Sherrod*, 631 F.3d 839, 842 (7th Cir. 2011); *see also Miller v. Henman*, 804 F.2d 421, 426 (7th Cir. 1986) (manuals not created under the Act do not create enforceable entitlements).

Here, Plaintiff has cited no Bureau policy that would create a right for Plaintiff under the Act.   Plaintiff only states in his complaint that the Defendants' actions and the policies of the Bureau of Prisons in failing to adequately treat age-related pain and arthritis is a violation of the Act.   He does not point to any regulation promulgated under the Act that is implicated by the actions of the Defendants.   Plaintiff mentions Bureau of Prisons Program Statements under his request for injunctive relief, but the Seventh Circuit and other circuits have noted that these statements are altered at will and not subject to rule-making proceedings so as to create a right under the Act.   *E.g.*, *Robinson*, 631 F.3d at 842; *Perotti v. Quinones*, 488 F. App'x 141, 146 (7th Cir. 2012); *Solan v. Zickefoose*, 530 F. App'x 109, 111-12 (3rd Cir. 2013).   As such, the Court finds no avenue for relief for Plaintiff under the Administrative Procedure Act.

## B. Deliberate Indifference Claim

Plaintiff's complaint also alleges that Brooks was deliberately indifferent to his pain because she gave him ineffective medication and repeatedly denied tests and a

referral to a specialist.   Officials violate the Eighth Amendment's proscription against "cruel and unusual punishment" if they display deliberate indifference to an inmate's serious medical needs.   *Greeno v. Daley*, **414 F.3d 645, 652–53 (7th Cir. 2005).   *Accord Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) ("Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution.")**.   While a prisoner is entitled to reasonable measures to meet a substantial risk of serious harm, he is not entitled to demand specific care.   *Forbes v. Edgar*, **112 F.3d 262, 267 (7th Cir. 1997).**

A prisoner who brings an Eighth Amendment medical claim must satisfy a two-prong test.   *Arnett v. Webster*, **658 F.3d 742, 750 (7th Cir. 2011).**   The first prong looks at whether the prisoner has an objectively serious medical need.   *Id.*   A condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or wanton infliction of pain if not treated.   *Gayton v. McCoy*, **593 F.3d 610, 620 (7th Cir. 2010).**   Only if the objective prong is satisfied is it necessary to analyze the second, subjective prong, which focuses on whether a defendant acted with a sufficiently culpable state of mind.   *Greeno*, **414 F.3d at 652–53.**

Prevailing on the subjective prong requires a prisoner to show that an official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Greeno*, **414 F.3d at 653.**   The plaintiff need not show that the physician literally ignored his problem, just that the physician was aware of the medical condition and either knowingly or recklessly disregarded it.   *Hayes v. Snyder*, **546 F.3d 516, 524 (7th Cir.**

**2008).**   In those situations where a physician actually provides treatment to an inmate, courts give deference to the physician's treatment decisions, as "there is not one proper way to practice medicine, but rather a range of acceptable courses."   *Jackson v. Kotter*, **541 F.3d 688, 697–98 (7th Cir. 2008).**   A doctor who chooses one routine medical procedure over another does not violate the Eighth Amendment.   *McGowan v. Hulick*, **612 F.3d 636, 641 (7th Cir. 2010).**   However, persisting in a course of treatment known to be ineffective can state a constitutional claim.   *Greeno*, **414 F.3d at 655.**   Deliberate indifference may also exist when a provider refuses to refer a patient to a specialist for treatment of a painful condition that clearly requires a referral.   *Berry v. Peterman*, **604 F.3d 435, 440 (7th Cir. 2010);** *Hayes v. Snyder*, **546 F.3d 516, 526 (7th Cir. 2008).**

Here, the Court finds no evidence of deliberate indifference by Brooks.   The evidence indicates that Brooks saw Plaintiff for the first time on October 1, 2012, for pain in his right knee.   At the time she noted Plaintiff already had x-rays which indicated only mild degenerative joint disease.   She continued his Naproxen prescription and ordered an injection of a steroid for his knee if the pain did not improve.   Brooks later injected Plaintiff's knee on October 17, 2012.   She later saw Plaintiff in February 2013 for chronic pain and noted that he had mild degenerative disc disease and degenerative joint disease but that he was able to walk and had full range of motion.   She continued with a prescription of Gabapentin.   The evidence indicates that Brooks saw Plaintiff several times, prescribed him different medications to treat his pain, provided him with steroid shots, and tried various treatments to treat Plaintiff's chronic pain which, as Dr.

Szoke noted, was caused by changes to his weight bearing skeleton due to age.

Plaintiff also presented to Brooks on other occasions for new occurrences of pain. He presented to her on November 15, 2012, for new pain in his right hip and later for left elbow pain which had developed while doing pull-ups.   Each time, Brooks evaluated Plaintiff and either prescribed medication or advised him to perform exercises and stretching.   For his hip pain, Brooks provided an oral steroid that Plaintiff reported helped with his problem.   Brooks also treated the new pain in his elbow by advising him to engage in range of motion activities.   She also instructed him to continue with over the counter pain medications, which Plaintiff said he had been taking even though his commissary receipts did not reflect those purchases.   Brooks ordered x-rays when Plaintiff's hip pain returned in May 2013 and she found only mild joint disease.   She saw Plaintiff again in September 2013 for his elbow pain and he indicated he had been taking over the counter pain medication, a statement which the commissary receipts did not support.   Brooks instructed him not to engage in sports or exercise but she later observed Plaintiff participating in yoga.   X-rays for Plaintiff's elbow were negative.

The Court finds no evidence to suggest that Brooks was deliberately indifferent to Plaintiff's newer hip and elbow issues.   The record reflects that Brooks tried to treat Plaintiff's newer problems by ordering x-rays, providing him with prescription and over the counter medication, and instructing him on how to help heal his injuries.   Some of that initial treatment reduced Plaintiff's pain, and the rest might have helped had Plaintiff actually heeded Brooks' advice.   He did not, and Brooks cannot be faulted for

Plaintiff's noncompliance.  *See Blankenship v. Birch*, **590 F. App'x 629, 633 (7th Cir. 2014) ("[W]hen a prisoner chooses not to receive treatment, including pain medicine prescribed by a doctor, the doctor is not deliberately indifferent.").**  In the end, the record shows that Brooks was not deliberately indifferent to Plaintiff's new pain issues.

Nor is there evidence that Brooks continued with an ineffective course of treatment for Plaintiff's knee pain.  *See Kelley v. McGinnis*, **899 F.2d 612, 616 (7th Cir. 1990) (indifference could exist if a doctor continues with treatment knowing it to be ineffective).**  Instead, Brooks treated Plaintiff with different medications, ordered x-rays at various points which always showed only degenerative joint and disc disease, and Plaintiff was provided with various treatments to help manage his pain.

Plaintiff does point out that he was recently seen by a specialist in 2015 for his knee pain and an arthroscopy was recommended.   Plaintiff argues that this shows that his dispute with the course of treatment for his pain was not just a mere disagreement but rather deliberate indifference on Brooks' part.  *See Johnson v. Doughty*, **433 F.3d 1001, 1013 (7th Cir. 2006);** *Edwards v. Snyder*, **478 F.3d 827, 831 (7th Cir. 2007).** However, Brooks was a physician's assistant and there is no evidence that she could have referred Plaintiff to a specialist.   As a physician's assistant, she saw Plaintiff on many occasions, relied on x-rays and the diagnosis of the doctor, and treated Plaintiff with pain medications for what was diagnosed as chronic pain.   During the period that Plaintiff saw Brooks, he was also seen by Dr. Szoke, the clinical director, and Harvey, the North Central Medical Director.   Both diagnosed him with degenerative joint disease

and provided him with medication.   Thus, there is no indication that Brooks was indifferent in not referring Plaintiff to a specialist.[1]   Because the record does not suggest that Brooks was deliberately indifferent, she is entitled to summary judgment.

## C.  Religious Freedom Restoration Act Claim

Under the Religious Freedom Restoration Act, the government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless it "demonstrates that application of the burden to the person" is "in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest."   **42 U.S.C. § 2000bb-1**.   A substantial burden is one that "bears direct, primary, and fundamental responsibility" for rendering a religious exercise "effectively impracticable."   ***Korte v. Sebelius*, 735 F.3d 654, 682 (7th Cir. 2013).**   To make out a claim, the Plaintiff need only show an honest conviction, not a correct interpretation, of his religious obligation.   ***Id.* at 683.**   Whether that conviction is substantially burdened by the government's action is a legal determination.   ***Grace Schools v. Burwell*, 801 F.3d 788, 804 (7th Cir. 2015).**

---

[1] The Court notes that Brooks is the only medical professional that was sued by Plaintiff for deliberate indifference.   But even if Dr. Szoke had been sued for deliberate indifference, the referral to a specialist in 2015 alone does not indicate deliberate indifference as the Court does not have a complete set of medical records.   The medical records provided to the Court end in early 2014.   Plaintiff was not seen by a specialist until June 2015.   There are no records between the two dates to indicate why Plaintiff was eventually referred to a specialist.   It is quite possible that there were new, additional circumstances that warranted the referral that would not have indicated deliberate indifference on Szoke's part in treating Plaintiff between the time period relevant to Plaintiff's claims.   Plaintiff has not offered any subsequent records indicating why he was referred to a specialist.   In any event, only Defendant Brooks was sued, and the Court finds no evidence to show deliberate indifference on her part.

Here, the Court finds that Plaintiff has made out a prima facie case that his religious beliefs were substantially burdened by the prison's medication distribution policy.  Defendants appear to concede that Plaintiff's right to practice Ramadan was infringed by the Bureau of Prisons' actions.  Defendants admit that they decided not to have a pre-dawn morning pill line during Ramadan.  And while Defendants assert that the addition of a predawn morning pill line was "not required by the Muslim faith," (Doc. 86 at 13), they do not argue or offer any competent evidence that Plaintiff's religious beliefs were insincere.  Nor do they argue or provide any evidence to support the position that Plaintiff's beliefs were not substantially burdened in the absence of a predawn pill line.  The record reflects only that by not having a pill line prior to the start of Ramadan, Plaintiff was forced to choose between observing Ramadan and taking his morning medications during the pill line which took place during the Ramadan fast.

Once a plaintiff makes out a prima facie case that his religious practices have been substantially burdened by the government's actions, "the burden shifts to the government to justify the burden under strict scrutiny." *Korte v. Sebelius*, **735 F.3d at 673.**  The Court gives due deference "to the experience and expertise of prison administrators" in evaluating a compelling governmental interest, *Williams v. Snyder,* **367 F. App'x 679, 682 (7th Cir. 2010)**, and grants security concerns "particular sensitivity," *Cutter v. Wilkinson*, **544 U.S. 709, 723-24 (2005).**  Despite this administrative deference and sensitivity, the government must still offer a substantive explanation for burdening an inmate's religious practices, *Lovelace v. Lee*, **472 F.3d 174,**

**191-92 (4th Cir. 2006)**, and must support any compelling interest in the record, *Koger v. Bryan*, **523 F.3d 789, 800-01 (7th Cir. 2008).** Mere speculation is not enough to carry the government's burden. *United States v. Hardman*, **297 F.3d 1116, 1130 (10th Cir. 2002).**

The Court finds that, at least at this stage, Defendants have not met their burden of establishing that they had a compelling interest and used the least restrictive means. Defendants indicate in their brief that adding a morning pill line would substantially burden the facility by adding overtime expenses and a security threat due to the limited staff which are on duty during the morning watch. However, Defendants have not supported their position with any facts in the record. Defendant Winklemeir indicates that he spoke with the National Chaplain about Muslims taking chronic medication during the fast period and was told that Islamic law does not require the adjustment of pill lines. However, none of this is supported by any evidence in the record. Nor have Defendants offered any evidence that adding a morning pill line prior to the start of the fasting period would cause expense or a threat to the prison's security. Further, Plaintiff has offered evidence that another prison added a morning pill line to accommodate those inmates who observed Ramadan. As Defendants have not supported their position with evidence, the Court cannot accept their speculation that an additional pill line would have caused security and expense issues. *See Koger*, **523 F.3d at 800-01;** *see also Davila v. Gladden*, **777 F.3d 1198, 1207 (11th Cir. 2015) (finding that where the prison did not offer evidence "to justify its costs and safety concerns, the requirements of [the Act] have not been met").** Accordingly, the Court must deny

summary judgment as to the Bureau of Prisons and Winklemeir.

However, the Court notes that Plaintiff's Religious Freedom Restoration Act claims, to the extent that they are against Defendants in their official capacity, are limited to injunctive relief.   Although the Seventh Circuit has not directly ruled on the issue, other courts have consistently held that the Act did not waive sovereign immunity so as to authorize official capacity suits for money damages.   *See Davila,* **777 F.3d at 1209-10;** *see also Webman v. Fed. Bureau of Prisons,* **441 F.3d 1022, 1026 (D.C. Cir. 2006).**

That said, there is no case law which bars a plaintiff with a Religious Freedom Restoration Act claim from seeking money damages against a defendant in his individual capacity.   The Seventh Circuit has previously held that the Act entitles a prisoner to sue a prison official in his individual capacity.   *See Mack v. O'Leary,* **80 F.3d 1175, 1177 (7th Cir. 1996),** *vacated on other grounds by O'Leary v. Mack,* **522 U.S. 801 (1997);** *see also Nelson v. Miller,* **570 F.3d 868, 888-89 (7th Cir. 2009) (similar language in another statute "contemplates individual capacity liability").**   And while the Seventh Circuit has foreclosed personal money damages for claims under the similarly-worded Religious Land Use and Institutionalized Persons Act, that ruling did not depend on an affirmative limitation in the Religious Land Use statute, but on the fact that the Religious Land Use statute was enacted under Congress' spending power, so allowing state officials to be sued individually for money damages under that Act would raise constitutional problems.   *Nelson,* **570 F.3d at 888-89.**   The Religious Freedom Restoration Act does not have the same limitation, as it was not enacted under the

Spending Clause and only applies to the federal government. *O'Bryan v. Bureau of Prisons*, **349 F.3d 399, 401 (7th Cir. 2003).** Given that point and the fact that the language of the Religious Freedom Restoration Act does not foreclose personal money suits, the Court finds that the Religious Freedom Restoration Act permits individual money suits. *Patel v. Bureau of Prisons*, **-- F. Supp. 3d --, No. 09-200, 2015 WL 4999906, at \*6 (D.D.C. Aug. 21, 2015).** Accordingly, there remains a viable individual claim against Winklemeir, as he purportedly chose not to add a morning pill line.

Winklemeir argues that he is entitled to qualified immunity as to Plaintiff's claim against him under the Religious Freedom Restoration Act. However, in his brief, Winklemeir only argues that he was an administrator and had no involvement in Plaintiff's "medical care," with no discussion as to his personal involvement regarding pill lines during Ramadan. Once more, the fact section of his brief indicates that Winklemeir was involved in the decision to not institute a morning pill line to accommodate Ramadan, as Winklemeir indicates that he sought guidance from the National Chaplain but ultimately decided not to adjust the morning pill line schedule. As such, Winklemeir has not shown that he is entitled to qualified immunity.

### D. First Amendment Claim

Defendant Winklemeir also argues that he is entitled to summary judgment on Plaintiff's First Amendment claim. Plaintiff has not addressed any First Amendment claim in his responsive brief. To the extent that Plaintiff raised a First Amendment claim in his complaint, his failure to respond to Defendant Winklemeir's arguments

constitutes an admission of the merits of Defendant's motion.   *See* **Southern District of Illinois Local Rule 7.1(c) ("Failure to timely file a response to a motion may, in the Court's discretion, be considered an admission of the merits of the motion.").**

With regard to *Bivens* violations under the First Amendment, the United States Supreme Court in *Bivens* "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." ***Bivens*, 403 U.S. at 388.**   Implied causes of action are disfavored, though, so the Court has been reluctant "to extend *Bivens* liability to any new context or new category of defendants." ***Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001).** While *Bivens* actions have addressed violations of the equal protection component of the Fifth Amendment's Due Process Clause, the United States Supreme Court has not found an implied damages remedy under the Free Exercise Clause.   ***See Davis v. Passman*, 442 U.S. 228 (1979).**   In fact, the Court "has declined to extend *Bivens* to a claim sounding in the First Amendment." ***Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009); *see also Turkman v. Hasting*, 789 F.3d 218, 236 (2nd Cir. 2015) (finding that plaintiff could not bring a free exercise claim under *Bivens*).**   Thus, the Court agrees with Winklemeir that Plaintiff's *Bivens* claim under the First Amendment is not viable.

But even if *Bivens* did allow for a claim under the First Amendment, Plaintiff would have to show that Winklemeir acted with a discriminatory purpose.  ***See Iqbal*, 556 U.S. at 676.**   Here, Plaintiff has not shown that Winklemeir acted with a discriminatory purpose and Winklemeir argues that he did not add an additional pill

line due to limited staffing and security reasons.   Given that there is no indication of discriminatory purpose, the Court finds that Plaintiff's First Amendment claim must fail.

CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment.   The Court finds that Defendants Bureau of Prisons, Harvey, and Brooks are entitled to summary judgment as to Plaintiff's claim under the Administrative Procedures Act; that Brooks is entitled to summary judgment on Plaintiff's deliberate indifference claim; and that Winklemeir is entitled to summary judgment on Plaintiff's First Amendment claim.   However, the Court finds that Defendants Bureau of Prisons and Winklemeir have not met their burden on Plaintiff's Religious Freedom Restoration Act claim and that claim remains for trial.   The Court will proceed to trial on Plaintiff's Religious Freedom Restoration Act claims against the Bureau of Prisons and Winklemeir in their official capacities for injunctive relief and against Winklemeir for damages in his individual capacity.

IT IS SO ORDERED.

DATED:   January 8, 2016

/s/ **Michael J. Reagan**
**Chief Judge Michael J. Reagan**
**United States District Court**